UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| JOHN W. JENTZ, | ) | |
| JUSTIN BECKER and AMBER BECKER, | ) | |
| ROBERT SCHMIDT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:10-cv-00474-MJR-PMF |
| | ) | 3-10-cv-00952-MJR-PMF |
| CONAGRA FOODS, INC., et al. | ) | 3-10-cv-00391-MJR-PMF |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## DEFENDANT CONAGRA'S POST-TRIAL MOTION

NOW COMES defendant ConAgra Foods, Inc. (ConAgra), by its counsel, and pursuant

to FRCP 50(a) and FRCP 59(a) and (e) moves for the following relief:

    (a)    judgment in ConAgra's favor and against all plaintiffs as to plaintiffs' claims, or in the alternative, as to plaintiffs' claims for punitive damages;

    (b)    judgment in ConAgra's favor and against West Side as to ConAgra's claims and West Side's claims;

    (c)    alternatively, a new trial as to all issues of liability and/or damages in the case;

    (d)    in the further alternative, a remittitur of the verdicts to the following amounts: Justin Becker [$8 million compensatory (prior to adjustment) and $0 punitive]; John Jentz [$12 million compensatory (prior to adjustment) and $0 punitive]; and Robert Schmidt: [$750,000 compensatory (prior to adjustment) and $0 punitive]; and

    (e)    such other and further relief that this Court deems just.

In support hereof, ConAgra states:

## I.    ConAgra Is Entitled To Judgment As A Matter Of Law On Liability And Punitive Damages.

1416930.1

A motion for judgment notwithstanding the verdict should be granted when, viewing the evidence in the light most favorable to the prevailing party, "there is no 'legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Lane v. Hardee's Food Sys., Inc.*, 184 F.3d 705, 706-07 (7th Cir. 1999) (quoting Fed. R. Civ. P. 50(a)(1)).  Here, there is simply no basis for a reasonable jury to find ConAgra liable, much less to find punitive damages warranted.

It is undisputed that ConAgra hired West Side for the very purpose of remediating dangerous conditions in one of its grain storage bins, and that West Side was on site for seven days, and had almost completed the job, when plaintiffs were injured in the course of their remediation efforts.  Based on these facts, there are at least three different ways to frame the liability issue as a matter of law, but the result is the same no matter how the issue is framed. *First*, ConAgra owed no legal duty to persons hired to remediate dangerous conditions with respect to those very conditions, who assumed the risk of harm.  *Second*, even if ConAgra did owe plaintiffs some sort of overarching duty to protect them from the very harm they were hired to remediate, ConAgra did not breach any such duty.  *Third*, even if ConAgra owed plaintiffs a duty and breached that duty, any such breach was not the proximate cause of plaintiffs' injuries. And, for the same reasons that there is no basis for a reasonable jury to find liability as a matter of law, there is certainly no basis for a reasonable jury to find the heightened standard for punitive damages satisfied as a matter of law.  Each of these points is addressed in turn below.

## A. ConAgra Is Entitled To Judgment As A Matter Of Law On Liability.

### 1.  ConAgra Did Not Owe Plaintiffs A Duty Of Care.

As an initial matter, a premises owner like ConAgra is not an insurer of the safety of all invitees on its property.  Here, ConAgra hired West Side—an expert in bin remediation—to

remediate dangerous conditions on ConAgra's property, and West Side in turn brought plaintiffs onto ConAgra's property to carry out the remediation efforts.  While ConAgra may have had a duty to protect plaintiffs from certain unexpected or hidden conditions, like a hidden trapdoor or a spring-gun, *see Northwestern El. R.R. v. O'Malley*, 107 Ill. App. 599, 604 (Ill. Ct. App. 1903), it had no duty to protect them from ***the very harm that they were invited onto the premises to remediate***.  It is black-letter law in Illinois that contractors necessarily assume the risk of injuries occasioned in the scope of their employment, and that any duty with respect to such work is correspondingly erased.  *See Clark v. Rogers*, 137 Ill. App. 3d 591, 594-95, 484 N.E.2d 867, 869-70 (4th Dist. 1985) ("This form of the doctrine is generally referred to as 'primary' assumption of the risk.  Under this form, the plaintiff has agreed to relieve the defendant of any duty.") (citing Prosser & Keeton on Torts § 68 at 480, 496–97 (5th ed. 1984).

This rule is analogous to the long-established "firefighter's rule," under which "an owner or occupier of land must exercise reasonable care to prevent injury to firemen that might result from a cause ***independent*** of the fire, but has no duty to prevent injury resulting from the fire itself."  *Vroegh v. J & M Forklift*, 165 Ill. 2d 523, 527, 651 N.E.2d 121 (1995) (emphasis supplied).  And although the firefighter's rule involves public officers, courts universally recognize the same principle for contractors.  *See, e.g.*, *Keating v. 68th and Paxton, L.L.C.*, 401 Ill. App. 3d 456, 471-72, 936 N.E.2d 1050, 1064 (1st Dist.. 2010); *Moody v. Delta Western, Inc.*, 38 P.3d 1139, 1142 (Alaska 2002) ("Property owners should not be deterred by the threat of liability to the contractor from summoning experts to repair their property, regardless of why repairs are needed…. [O]wners have paid for the contractor's expertise at confronting the very danger that injured him and should not have to pay again if the contractor is then injured."); *Nofsinger v. Irby*, 961 So.2d 778, 781 (Ala. Ct. App. 2007) ("When a danger exists, which is

3

inherent to the work the independent contractor is employed to perform, or which arises from or is intimately connected with the work to be performed, the employer's duty to protect the contractor is absolved."). And this rule makes eminent policy sense: if property holders were responsible for injuries caused by dangerous conditions on their property to persons brought onto the property to remediate those very conditions, property holders would be deterred from such remediation.

This common-sense point precludes any finding of liability here: ConAgra hired plaintiffs to remediate a grain elevator at risk of fire. Having agreed to perform the work, and having indeed proceeded to perform the work almost to completion, plaintiffs cannot now seek to hold ConAgra liable for the injuries caused by the very conditions they were brought onsite to remediate. Plaintiffs were brought in as experts to remediate the concededly dangerous conditions in the bin, and ConAgra is not an insurer of their safety on the job.

Plaintiffs, however, ignore this commonsensical limitation on liability and instead argue that ConAgra had an all-purpose duty to ensure that its facility was safe—in other words, to remediate the facility before West Side remediated it. This cannot be the law for the reasons discussed above. But even if there were such a duty, plaintiffs would still be deemed to have **assumed the risk** of a grain-elevator fire, and thus ConAgra cannot be liable.

As a threshold matter, West Side's contract with ConAgra made West Side "solely responsible for all construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the work under [its] Agreement," and "responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the work and [to] comply with all applicable laws, ordinances, rules, regulations and orders of any public authority." (Def. Ex. 93, ¶¶ 5, 7.) By this delegation, West Side, not ConAgra, assumed

4

responsibility for plaintiffs' safety. *See Platt v. Gateway Intern. Motorsports Corp.*, 351 Ill. App. 3d 326, 330, 813 N.E.2d 279 (5th Dist. 2004) (noting that "parties may allocate the risk of negligence as they see fit, and exculpatory clauses do not violate public policy as a matter of law").

In addition, an employee or contractor is deemed to have assumed the risk of an injury when he continues to work "with knowledge of the defect and danger." *Kelly v. Fletcher-Merna Co-op. Grain Co.*, 29 Ill. App. 2d 419, 425-26, 173 N.E.2d 855 (3d Dist. 1961); *see also Torrington Co. v. Hill*, 219 Ga. App. 453, 465 (Ga. Ct. App. 1995). This rule reflects the commonsensical point that agreements may be implied, just as they may be written—and that continuing to work in the presence of an open danger amounts to an implied agreement to assume the risk of such danger. *See, e.g., Matthews v. Avalon Petroleum Co.*, 375 Ill. App. 3d 1, 15, 871 N.E.2d 859, 870 (1st Dist. 2007) ("A defendant generally has 'no duty to warn' if a reasonable person in the plaintiff's position 'would appreciate the danger.' "); *Hastings v. Exline*, 326 Ill. App. 3d 172,176, 760 N.E.2d 993, 999 (4th Dist. 2001) (finding assumption of the risk where plaintiff knew of dangerous condition on stairway and proceeded regardless).

Here, there is no dispute that plaintiffs were aware of the dangers. West Side was onsite at the facility for ***seven days*** before the explosion, and was accordingly aware of its condition. Indeed, West Side's foreman inspected the jeopardized facility before beginning work. (5/24 at 122: Flitsch). West Side, moreover, was experienced in remediation of bin fires (5/11 a.m. at 33: Sumner), and held itself out as an expert in the same (5/10 p.m. at 228: Sumner). Thus there cannot be any doubt that it was aware of the dangers and assumed the risk of their occurrence by beginning work. Notably, whether plaintiffs themselves subjectively understood the nature of the risks they faced in performing their job responsibilities is irrelevant. West Side and A&J

undoubtedly understood those risks; plaintiff's suit should then be against West Side and A&J, not ConAgra, for failing to disclose them. *See, e.g. Lewis v. Norfolk Southern Railroad, Inc.*, 2010 WL 2851131 (D.S.C. 2010) (granting motion for summary judgment and holding that if the landowner warns of a danger to the independent contractor, or if the independent contractor is independently is aware of the dangerous conditions, any duty of the landowner to warn the contractor's employees is discharged) (citations omitted).

### 2. ConAgra Did Not Breach Any Duty Of Care To Plaintiffs.

Alternatively, the same common-sense point set forth above could be reframed under the rubric of "no breach." Even if ConAgra owed the employees of its contractors and subcontractors a duty of care, it did not breach that duty on the facts of this case. Those employees came to the danger of their own volition, as part of their employment for companies that engaged in this kind of dangerous work. ConAgra did not direct the remediation operations at the bin; West Side did. At the time West Side began the work, the bin was safe for remediation. Indeed, West Side foreman Mel Flitsch testified that on April 20, he was "amazed" by the bin's clarity; there was no fire, smoldering, embers, or smoke (5/24 p.m. at 121-22).

If additional safety precautions were needed at the work site, West Side—the remediation expert—should have implemented them. West Side did not need ConAgra's permission. To the contrary, through the contract, West Side obtained such permission. On the day of the accident, West Side had not only the right but the duty to call the fire department for any needed help. Because ConAgra gave West Side full control and clear direction to do everything needed to keep workers safe, ConAgra satisfied any duty of care to West Side (including its employees and subcontractors). *See Herrera v. United Fire & Casualty Co.*, 27 So.3d 919, 922 (La. Ct. App. 2009). Again, a property owner is not an insurer of the safety of its business invitees. *Barber v.*

6

*G.J. Partners, Inc.*, 2012 IL App (4th) 110992, ¶25, 2012 WL 3594956.  ConAgra did not breach a duty of care by failing to keep plaintiffs safe from the work they were retained to perform.

Evidence regarding ConAgra's actions or omissions ***before*** the start of West Side's work did not create an issue of fact as to a breach of duty.  In *Board of Trustees of Community College District No. 508 v. Coopers & Lybrand*, 208 Ill.2d 259, 803 N.E.2d 460 (2003), the Board sued defendant for malpractice after defendant's audit failed to uncover and report inappropriate investments by the treasurer of a city college system.  Defendant claimed that the Board was itself negligent by failing to properly oversee a treasurer notwithstanding the Board's knowledge of possible investment policy violations.

The Illinois Supreme Court ruled that a client's poor business practices leading to an audit may not be offered as a defense to an auditor's negligent failure to uncover inappropriate conduct.  *Id*. at 266-72.  The Court stated that the rule is "***consistent with the general tort principles applicable to actions against service providers***" and also consistent with the Restatement (Third) of Torts:

> "[I]n a case involving negligent rendition of a service, … a factfinder ***does not consider any plaintiff's conduct that created the condition the service was employed to remedy***."  Restatement (Third) of Torts: Apportionment of Liability §7, Comment *m*, at 70 (2000).  *Id*. at 270-71 (emphasis supplied).

The Court noted that it had previously applied the reasoning of the Restatement:

> [I]n *Owens v. Stokoe*, 115 Ill.2d 177 (1986), a dental malpractice case, this court clearly applied this reasoning.  The trial court allowed the jury to consider plaintiff's contributory fault in making dental surgery necessary.  This conduct consisted of failure to secure a second opinion, poor dental hygiene, and the refusal to allow the dentist to take X rays of his teeth.  In reversing the judgment for defendant, we held:
>
> "In order to reduce the award of damages the negligence of the plaintiff must have been a proximate cause of the injuries.  Here, paraesthesia was proximately caused by damage to the left inferior

> alveolar nerve during surgery.  Performance of the surgery caused
> the injury.  Obviously, it was not the failure of the plaintiff to
> obtain a second opinion, or his prior poor hygiene, or his refusal, if
> true, to permit X rays to be taken of his teeth that damaged the
> nerve.  In is undisputed that the parathesia resulted from the
> surgery, and ***it cannot be said that the conduct of the plaintiff
> prevented Stokoe from properly performing the surgery***."
> (citation omitted).  *Id.* at 271 (emphasis supplied).

In short, the patient's conduct only created the conditions presented to the dentist at the time of

the surgery.  They did not cause the dentist to commit an act of malpractice.  So the patient's

conduct did not serve to reduce his recovery.

Although the setting here is different, the principles of *Board of Trustees* are equally

applicable.  A service provider must deal with the conditions presented to it.  It is irrelevant that

those conditions might have been different or that the job would have been easier if the provider

had been brought onto the job earlier.  It is also irrelevant that a client caused the very conditions

which a provider has been asked to remedy.  None of these things are the cause of negligence by

the provider.

Here, ConAgra's conduct merely created the condition that service-provider West Side

was retained to remedy.  Once West Side started the job, it became West Side's duty to exercise

ordinary care in dealing with the existing situation.  That is why it was hired.  If West Side was

unwilling to deal with the existing situation, it should have refused to accept the job.  Treating

ConAgra's conduct prior to West Side's work as negligence would be like blaming a patient for

allowing an untreated tooth to cause an abscess that a dentist negligently treated.  Here, the

injury flowed from West Side's work, not from ConAgra's conduct prior to West Side's

appearance on the job.  ConAgra's conduct before West Side started the job did not cause West

Side's failure to timely evacuate the site, notify ConAgra of the fire, and call the fire department

on April 27.  Under the contract, West Side had assumed the duty to initiate all safety

procedures, which would have included evacuating the site and calling the fire department. Indeed, by delineating West Side's duty ConAgra protected plaintiffs from harm flowing from confusion as to who was responsible for safety measures. West Side was. And ConAgra's conduct did not cause West Side to send two workers into the tunnel after West Side had shut down the job and told ConAgra to call the fire department.

As a matter of law, ConAgra did not breach a duty to plaintiffs.

### 3.   ConAgra did not proximately cause plaintiffs' injuries.

Even assuming *arguendo* that ConAgra owed plaintiffs a duty and breached that duty, the evidence here still does not warrant liability because any such breach was not a proximate cause of plaintiffs' injuries. *See Johnson v. Wal-Mart Stores, Inc*., 588 F. 3d 439, 441 (7th Cir. 2009). Fault and proximate cause are "distinct, albeit related, concepts." See *McDonnell v. McPartlin*, 192 Ill. 2d 505, 522, 736 N.E.2d 1074 (2000). " 'A proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause.' " *Johnson* at 441. As a matter of law, plaintiffs failed to prove this element.

Proximate cause consists of cause in fact and legal cause. *Abrams v. City of Chicago*, 211 Ill. 2d 251, 258, 811 N.E.2d 670 (2004). Conduct is a cause in fact only if it is a material element and substantial factor in bringing about an injury. *Id*. "[A]bsent that conduct, the injury would not have occurred." *Id*. Legal cause "is largely a question of foreseeability." *Id*. It asks "whether 'the injury is of a type that a reasonable person would see *as a likely result* of his or her conduct.' " *Id*. (emphasis in original).

Illinois law contains "a special subset of proximate cause cases involving injuries caused by the intervening acts of third persons… ." *Id*. at 259. In *First Springfield Bk. & Tr. v. Galman*, 188 Ill. 2d 252, 720 N.E.2d 1068 (1999), defendant illegally parked his truck in a no-

parking zone on the north side of Lawrence Street, about 41 feet beyond its intersection with English Street.  An 18-year old foreign exchange student walking south on English planned to cross Lawrence.  Instead of using the marked intersection crossing, she turned right and walked westbound on the north side of Lawrence.  Once she reached the front of the truck, she tried to cross Lawrence.  As she reached the center line, she was struck by Galman's car.  A jury found the truck driver (and his employer) negligent.  The trial court denied their jnov motion, and a divided appellate court affirmed.

The Supreme Court reversed and entered judgment for defendants:

> [I]llinois courts draw a distinction between a condition and a cause.  Indeed, if the negligence charged does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent, independent act of a third person, the creation of a condition is not the proximate cause of the injury.  *Briske v. Village of Burnham*, 179 Ill. 193, 199 (1942); *Merlo v. Public Service Co.*, 381 Ill. 300, 316 (1942); see also *Thompson*, 154 Ill. 2d at 383.  ***The test that should be applied in all proximate cause cases is whether the first wrongdoer might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence.***  *Merlo*, 381 Ill. at 317.  *Id.* at 257 (emphasis supplied).

The Court refused to abandon the *condition-v.-cause* dichotomy in favor of an allegedly different standard articulated in *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432 (1992):

> [T]he parties appear to be operating under the mistaken assumption that *Briske, Merlo,* and *Thompson*, are distinct from and wholly incompatible with *Lee*.  This is not the case.  Although *Briske, Merlo,* and *Thompson* clearly employ a vocabulary different from that employed in *Lee*, all of these cases ask the same question:  Was the defendant's negligence a material and substantial element in bringing about the injury, and, if so, was the injury of a type that a reasonable person would see as a likely result of his or her conduct?  While *Lee* sets forth this principle in general terms, *Briske, Merlo,* and *Thompson* **address a particular subset of cases, namely, those in which the plaintiff's injury results not from the defendant's negligence directly but from the subsequent, independent act of a third person** (footnote omitted).  Thus, *Briske, Merlo,* and *Thompson* ask whether the defendant's conduct

10

was a cause of the injury or simply furnished a condition by which the injury was made possible, they are in effect asking whether the defendant's conduct was a material and substantial element in bringing about the injury. Similarly, when *Briske*, *Merlo*, and *Thompson* ask whether the defendant might have reasonably anticipated the intervening efficient cause as a natural and probable result of his or her own negligence, they are in effect asking ***whether the intervening efficient cause was of a type that a reasonable person would see as a likely result of his or her conduct***. Far from conflicting, *Briske*, *Merlo*, *Thompson*, and *Lee* uniformly embrace the traditional proximate cause test that has governed Illinois for the better part of this century. *Id. at 258-59* (emphasis supplied).

The Court held that defendants' conduct was a cause in fact but not a legal cause:

The relevant inquiry here is whether the injury is of a type that a reasonable person would see *as a likely result* of his or her conduct. *Lee*, 152 Ill. 2d at 456. We have no quarrel with First Springfield's assertion that "it was readily foreseeable that at school closing time school children might be crossing the street, and 16-year old Angela Galman might need both lanes of traffic to avoid an accident." That, however, is not the question. The question is whether it was reasonably foreseeable that violating a "no parking" sign at mid-block would likely result in a pedestrian's ignoring a marked crosswalk at the corner, walking to mid-block, and attempting to cross a designated truck route blindly and in clear violation of the law. Clearly, it was not. [Decedent's] decision to jaywalk, while undeniably tragic and regrettable, was entirely of her own making. [The truck driver/employer] neither caused [decedent] to make that decision, nor reasonably could have anticipated that decision as a likely consequence of their conduct. One simply does not follow from the other. *Id.* at 261 (emphasis in original).

In *Abrams*, defendant city refused plaintiff's 911 request for an ambulance to transport her to a hospital for labor and delivery. Plaintiff's friend drove her. The friend ran a red light and was struck by the car of an impaired person driving on a suspended license and speeding between 75-80 miles per hour. Plaintiff was injured, and her baby died. Plaintiff sued the city for willful and wanton misconduct. *Id.* The city successfully moved for summary judgment on grounds of proximate causation. 211 Ill. 2d at 255-56.

On appeal, the city essentially conceded that its conduct was a cause in fact of the collision.  *Id.* at 259.  However, the Supreme Court held that the city could "*not* have reasonably anticipated" that its refusal to send an ambulance would "likely result" in the drivers' conduct. *Id.* at 261-62 (emphasis in original):

> While all traffic accidents are to some extent remotely foreseeable (*DiBenedetto*, 153 Ill. 2d at 72), this is not the kind of harm that was sufficiently foreseeable from the refusal to send an ambulance so as to satisfy the "legal cause" portion of a proximate cause analysis.  In other words, the injury was not of a type a reasonable person would see as the *likely or probable result* of the refusal to send an ambulance.  See *Galman*, 188 Ill. 2d at 260-61; see also *Quirke v. City of Harvey*, 266 Ill. App. 3d 664, 670 (1994) (the defendant city could not have reasonably foreseen that one or both drivers would violate the statutory duty to treat an inoperable traffic light as a stop sign before proceeding into the intersection), citing *Ziemba v. Mierzwa*, 142 Ill. 2d 42, 50 (1991) (defendant landowner could not have reasonably foreseen that a truck driver who collided with a bicyclist would exit defendant's driveway without first ascertaining whether any traffic was approaching).  Instead, the City's conduct simply furnished a condition, making possible the injury caused by the independent, illegal acts of others.  *Id.* at 262 (emphasis in original).

As to Jentz and the Beckers, plaintiffs failed to prove legal cause.  Notwithstanding ConAgra's alleged fault, Jentz and Becker had evacuated the danger area and were in a position of safety.  Moments before the accident, Flitsch put them in a position of great danger:

> Q.    After you told Godfrey Friedt to call the fire department what did you do next?
>
> I'll withdraw the question.
>
> After you had the conversation with Godfrey Friedt, you told Mr. Becker and Mr. Jentz to go back down into the tunnel, true?
>
> A.    True.
>
> Q.    And they only had to walk 20 or 50 feet in response to your direction when the whole facility blew up in their face, true?

A.      True (5/24 p.m. at 165: Flitch).

Plaintiffs offered no evidence that Flitsch told ConAgra of its decision or that time remained for

ConAgra to countermand it.  Plaintiffs' liability expert Russell Ogle testified on direct

examination: "*If Mr. Jentz and Mr. Becker had not entered the tunnel, they would not have*

*been injured*" (5/14 a.m. at 68; emphasis supplied).  Defense expert Robert Schroeder agreed

(5/21 p.m. 118-20: Schroeder).  There was no contrary evidence.

Ogle agreed that there was "*[no] reason* for [Jentz and Becker] to be down in the tunnel

in the first place" (5/14 a.m. at 68; emphasis supplied).  Ogle's testimony reflected the

nationwide fire safety standard.  This Court may take judicial notice of public records of

administrative agencies.  *Wigod v. Wells Fargo Bank, N.A.*, 673 F. 3d 547, 556 (7th Cir. 2012).

*Geinosky v. City of Chicago*, 675 F. 3d 743, 745 n. 1 (7th Cir. 2012).  Attached as Exhibit 1to

this motion is a flier issued by the U.S. Fire Administration (a branch of FEMA)

(http://www.usfa.fema.gov/downloads/pdf/publications/fa_246f_print.pdf) stating: "Once You're

Out, Stay Out!" . . . "NEVER RE-ENTER A BURNING BUILDING!"  . . . and "IT IS

IMPORTANT TO PREVENT OTHERS FROM RE-ENTERING!"  This message is drummed

into the heads of young and old alike.  Becker learned as a child never to go into a burning

building (5/16 a.m. at 106).  It is a matter of common knowledge.  Because there was no reason

for the workers to be in the tunnel, there was no reason for ConAgra to anticipate that West Side

would send them there.  As Schmidt stated:  "I would have just waited.  I mean it's a drill" (5/17

p.m. at 153).

West Side's conduct was not reasonably foreseeable for an additional reason.  Illinois law

recognizes that criminal or other illegal conduct is generally unforeseeable.  *E.g.*, *Abrams*, 211

Ill. 2d at 261-62 (running red light, speeding, driving while impaired and on suspended license);

*Galman*, 188 Ill. 2d at 261 (ignoring marked cross walk, jaywalking); *Young v. Bryco Arms*, 213

13

Ill. 2d 433, 448-55, 821 N.E.2d 1078 (2004) (illegal use of hand guns); *City of Chicago v.*

*Beretta U.S.A.*, 213 Ill. 2d 351, 404-13, 821 N.E.2d 121 (2004) (same); *Thompson v. County of*

*Cook*, 154 Ill. 2d 374, 382-83, 609 N.E.2d 290 (1993) (driving while drunk, fleeing police,

speeding, disregarding traffic signs); *Watson v. Enterprise Leasing Co.*, 325 Ill. App. 3d, 914,

924-25, 757 N.E.2d 604 (1st Dist. 2001) (criminal driving under the influence; *Wade v. City of*

*Chicago*, 364 Ill. App. 3d 773, 784, 847 N.E.2d 631 (1st Dist. 2006) (illegal driving on

sidewalks);  *Morton v. City of Chicago*, 286 Ill. App. 3d 444, 455, 676 N.E.2d 985 (1st Dist.

1997) (traffic violations).  These cases are significant because of the jury's punitive damages

award against West Side.  Punitive damages are "penal" and "similar to a criminal penalty."

*Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414, 563 N.E.2d 397 (1990); *Kohlmeier v. Shelter*

*Ins. Co.*, 170 Ill. App. 3d 643, 658, 525 N.E.2d 94 (5th Dist., 1988).  Punitive conduct must

involve "some element of outrage similar to that usually found in crime" and approach "the

degree of moral blame attached to intentional harm… ."  *Loitz* at 415-16.

ConAgra could not have reasonably anticipated conduct so bad as to warrant punitive

damages.  The jury ordered punitive damages against West Side precisely because West Side

sent Jentz into the tunnel.  The verdicts prove this point.  The jury awarded $1 million in punitive

damages to Jentz, but $0 in punitive damages to Schmidt.  The only meaningful difference in

their cases was that West Side sent Jentz, but not Schmidt, into the tunnel.

Moreover, plaintiffs even failed to prove cause in fact as to all plaintiffs.  Absent

ConAgra's conduct, the accident still would have happened.  West Side contractually agreed to

be "***solely responsible*** for all construction means, methods, techniques, sequences and

procedures and for coordinating all portions of the work under [its] Agreement" (Def. Ex. 93, ¶5

(a): Work Order Contract; emphasis supplied).  West Side agreed to be "***responsible for***

14

***initiating, maintaining and supervising all safety precautions*** and programs in connection with the work and [to] comply with all applicable laws, ordinances, rules, regulations and orders of any public authority having jurisdiction for the safety of the persons or property or to protect them from damage, injury or loss (*Id.* at ¶7; emphasis supplied).  The jury found that these provisions were in effect.  Under them, West Side had taken control over the bin and for seven days had been safely removing the pellets.

This lengthy period of safe operations is relevant to the cause-in-fact analysis.  In, *Blood* v. *VH-1 Music First*, 668 F.3d 543 (7th Cir. 2012), defendant caused an accident resulting in a five-mile traffic jam.  Four hours later, a truck struck plaintiff's car moments after the car reached the back of the jam.  Plaintiff was injured and his brother killed.  *Id.* at 545.  Plaintiff sued defendant for starting the jam.  The district court granted summary judgment for defendant because the first accident did not cause the second accident.  The Seventh Circuit affirmed—the four-hour time difference between accidents broke the causal chain.  *Id.* at 548.  Here, the seven day difference broke the chain.  Mel Flitsch testified that when West Side started work on April 20, he was "amazed at how clear the bin was" (5/24 p.m. at 121).  There was no fire, smoldering, or embers (*Id.*).  He did not see smoke from the top or from the side vents (*Id.* at 121-22).  Flitsch found the bin "safe" for work (*Id.* at 122).

Furthermore, on April 27, the day of the accident, ConAgra neither started nor accelerated the fire.  West Side ran the removal operation, including the firefighting.  At all times, West Side had an absolute right and a contractual duty to call the fire department.  It had accepted responsibility for initiating "all safety precautions," a provision that the jury found West Side to have breached (Def. 93 at ¶7; jury verdict as to ConAgra property damage claim).

West Side never exercised its independent duty to timely evacuate the workers and call the fire department.

The record fully supports ConAgra's position.  Flitsch testified that at the start of work on April 27, the bin was clear, safe, and within West Side's skill to safely empty (5/24 p.m. at 147-48).  Flitsch knew that the core presented great danger in because it could generate heat, fire, and explosion.  He did not rely on ConAgra to teach him about the core or help him remove it.  *Id.* at 153.  Between 10:00-11:00 a.m. on April 27, Jentz radioed to Schmidt that he had found a burning ember in the tunnel (5/17 p.m. at 120-21: Schmidt).  Flitsch, Jentz, and Schmidt were on the same radio frequency (5/17 p.m. at 124: Schmidt).  Schmidt spoke to Flitsch and "probably did" tell him about the ember (*Id.* at 124-25).  Flitsch did not deny the conversation: "I do not remember if it was said.  If it was, and I'm not saying it wasn't.  I'm saying I do not remember, sir."  (5/24 p.m. at 154: Flitsch).  If told about the burning ember, Flitsch admitted that he should have called the fire department (*Id.* at 154-55).  He agreed that a burning ember meant that "there's a fire" (*Id.* at 155).  And that meant he should have called the fire department:

> Q.   If you had discovered burning embers that morning, you, sir, didn't need ConAgra to tell you to call the fire department?
>
> A.   No.
>
> Q.   You knew that was your job, to call the fire department because there's a fire in the bin –
>
> A.   Yes.
>
> Q.   --true?
>
> A.   Yes. (*Id.* at 155-56).

By 1:45 p.m., Flitsch knew that there was a fire in the bin (5/24 p.m. at 162: Flitsch).  The bin exploded around 3:45-4:00 p.m. (*Id.*).  Flitsch allowed two hours to pass before telling

16

Friedt to call the fire department (*Id*. at 163).  During that time, he did not tell Friedt that the bin

was on fire (*Id*.).  At 1:45 p.m. he should have ordered an evacuation (5/24 p.m. at 163).  When

Flitsch finally told Friedt to call, "there wasn't any time left on the clock… for the fire

department to get there and put that fire out" (*Id*. at 164-65: Flitsch).  The accident would have

happened without ConAgra's involvement.

Certainly as to Schmidt, there was no cause in fact.  Schmidt admittedly knew that the

presence of embers was a bad sign (5/17 p.m. at 121: Schmidt).  He knew for five and a half

hours about the potential for an explosion (*Id*. at 127).  But Schmidt did not tell ConAgra about

the ember (*Id*. at 129-30).  The workers did not call the fire department when they returned from

lunch and saw smoke pouring from the top of the bin (*Id*. at 133).  Schmidt and Flitsch did not

develop a safety plan to prevent an explosion (*Id*. at 136).  They had three hours before the bin

exploded, plenty time to evacuate workers and call the fire department (*Id*. at 136-37).  Instead,

Schmidt and Becker continued to fight the fire (*Id*. at 137-38).  The smoke was so heavy that

Schmidt donned a respirator (*Id*. at 139).  By 3:30 p.m., the bin was "out of control" (*Id*. at 146).

Only then did Schmidt order an evacuation and tell Flitsch to call the fire department (*Id*. at 146-

47).  From 10:00 a.m. until 4:00 p.m. Flitsch neither told Schmidt that he was going to call the

fire department nor ordered an evacuation (*Id*. at 151).  If Schmidt had not decided to evacuate,

he would have been on top when the bin exploded (*Id*.).  Even without ConAgra's involvement,

the bin would have exploded.  See also *Herrera v. United Fire & Casualty Co*., 27 So.3d 919,

922, 09-256 (La. App. 5th Cir. 2009) (no proximate cause).

Absent proof of proximate cause, there is no liability for compensatory or punitive

damages.  *Mitchell v. Elrod*, 275 Ill. App. 3d 357, 362, 655 N.E.2d 1104 (1st Dist. 1995) (no

punitive damages if no compensatory damages).  Plaintiffs failed to prove proximate cause.

ConAgra is entitled to JMOL as to all plaintiffs.

## B.   ConAgra Is Entitled To Judgment As A Matter Of Law On Punitive Damages.

### 1.   Plaintiffs did not meet the punitive damages test.

A willful and wanton claim can be used to support either compensatory or punitive damages.  *Ziarko*, 161 Ill. 2d at 276.  If supporting compensatory damages, willful and wanton misconduct "may be only degrees more than ordinary negligence… ."  *Id*. at 275.  If supporting punitive damages it must be "only degrees less than **intentional** wrongdoing."  *Id*. at 275-76; see also *Petty v. Chrysler Corp.,* 343 Ill. App. 3d 815, 828, 799 N.E.2d 432 (1st Dist. 2003) (emphasis supplied) (punitive damages requires conduct over and above conduct proving underlying claim).  Here, plaintiffs brought a willful and wanton claim solely to seek punitive damages.

The Illinois Supreme Court has set high the bar for obtaining them.  They may only be awarded if a tort is committed "with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Loitz*, 138 Ill 2d at 415, *quoting Kelsay v. Motorola, Inc*., 74 Ill. 2d 172, 186, 384 N.E.2d 353 (1978).

> "[P]unitive damages are not awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence" (citation omitted).  "Since the purpose of punitive damages is not compensation of the plaintiff, but punishment of the defendant and deterrence**,** these damages can be awarded *only for conduct for which this remedy is appropriate–which is to say, conduct involving some element of outrage similar to that usually found in crime.  The conduct must be outrageous, either because the defendant's acts are either done with an evil motive or because they are done with reckless indifference to the rights of others."* (citation omitted).  In this context, willful and wanton

misconduct " '*approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it.*' "

*Loitz*, 138 Ill. 2d at 415-16 (emphasis supplied).  In short, Illinois requires proof of a mindset so outrageous as to be quasi-criminal, conduct so morally blameworthy as to approach intentional harm.  The tortfeasor must act intentionally, consciously disregarding knowledge that his act will create a highly unreasonable risk of harm.

Noting Illinois' "rather dim view" of punitive damages, the Seventh Circuit has ruled that a plaintiff must demonstrate "extraordinary or exceptional circumstances clearly showing malice or willfulness." *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1396 (7th Cir. 1991).  Punitive damages should be denied "absent a finding of culpability that exceeds bad faith." *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 106 F.3d 1388, 1402 (7th Cir. 1997).

*Juarez v. Menard, Inc.*, 366 F.3d 479 (7th Cir. 2004), shows that the standard is very tough.  Though decided under Indiana law, the close identity between Illinois and Indiana law as to punitive damages makes *Juarez* relevant.  Plaintiff was seriously injured when Menard employees using machinery in an aisle to stock a shelf pushed a door onto plaintiff in an adjacent aisle.  Defendant successfully moved for summary judgment as to punitive damages, and the Seventh Circuit affirmed.  The Court noted that punitive damages are quasi-criminal in nature. *Id.* at 481.  Plaintiff was required to demonstrate by clear and convincing evidence that Menard acted with "malice, fraud, gross negligence or oppressiveness that was not the result of mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing." *Id.* at 482.  A defendant's general knowledge that conduct would probably cause injury is not enough.  "After all, most business owners understand that their operations pose some level

of risk to consumers." *Id.* A tortfeasor must act "with conscious indifference or heedless disregard of the consequences of her actions," a " 'quasi-criminal state of mind.' " *Id.*

Plaintiff could not meet that standard. Although Menard required employees to watch a video about falling merchandise, the video did not suggest keeping customers out of adjacent aisles. *Id.* at 482-83. Even if Menard should have realized that customers could be injured in adjacent aisles, the imputed knowledge did not prove a quasi-criminal mindset. *Id.* at 483. The evidence of sixteen prior injuries over five years involving falling merchandise was not sufficiently detailed to be probative. The Court found insufficient an affidavit that employees tried to warn Menard about falling merchandise and implemented their own safety procedures. *Id.* at 484. The affidavit did not indicate whether the employees warned Menard about merchandise falling in adjacent aisles. There is no indication that the homemade procedures were used in adjacent aisles. Although Menard prohibited such measures, the prohibition did not demonstrate malice, gross negligence, or willful and wanton misconduct. *Id.* The Court stated:

> In any case, although it might be wise for an employer to listen to the concerns of those who see workplace dangers first hand, Juarez has not offered any evidence for which a reasonable jury could find, by clear and convincing evidence, *that Menard's refusal to heed employees' safety suggestions, constituted the type of conduct for which punitive damages could be awarded*. *Id.* (emphasis supplied).

The Court also found evidentiary problems with the affidavit. It did not offer a basis for the claim that Menard was "indifferent" to the problem. *Id.* at n.4. The Court concluded: "[E]ven if we were to accept the truth of all of [affiant's] assertions, we would find that Juarez did not present sufficient evidence for a reasonable jury to award punitive damages." *Id.*

The evidence here was legally insufficient to support punitive damages. This Court has ruled that ConAgra did not intentionally harm plaintiffs (5/24 p.m. at 224). Even if ConAgra was negligent, it did not display the quasi-criminal mindset needed for punitive damages. There

20

had never been a prior bin fire or explosion at Chester.  A hot bin in Puerto Rico self-

extinguished (5/14 a.m. at 109: Ogle).  Absent further details, the Puerto Rico incident did not

provide notice of unreasonable dangers.  *Juarez*, 366 F.3d at 843.  Though ConAgra understood

that bins could explode, generalized knowledge that operations can result in injury is not enough.

*Juarez* at 842.  Evidence that ConAgra failed to regularly clean the bin and prematurely loaded

pellets into it is evidence of negligence at worst, particularly considering that the bin here

exploded *while in the course of remediation by experts brought in by ConAgra to address the*

*safety issue.*

The bin problem was discovered on March 12, 2010 (5/11 p.m. at 165: Garris).  That day,

ConAgra managers Godfrey Friedt and Scott Martin spoke to West Side's Ron Sumner about it

(5/23 a.m. at 67-68: Friedt).  West Side was a fire-bin expert, perhaps the industry's best (5/24

a.m. at 39-41: Schwers).  Sumner recommended sealing the bin to block oxygen (5/23 a.m. at 68:

Friedt).  ConAgra immediately started the process (*Id.* at 69-70).  Whether ConAgra completely

succeeded is irrelevant as to punitive damages.  ConAgra made a good faith effort (5/10 a.m. at

131 and p.m. at 152-53: Bindel; 5/15 a.m. at 47: Belcher).  At Sumner's recommendation,

ConAgra also placed the bin under a watch (5/15 a.m. at 49: Belcher).  ConAgra did everything

that Sumner asked (*Id.* at 47).

ConAgra met with Sumner on March 13, one day after discovering the problem.  Sumner

testified that the bin looked foggy, which prevented him from seeing the pellets (5/10 p.m. at

222, 229, 236).  He attributed the fog to decomposing pellets, not burning (*Id.* at 236).  He did

not see smoldering or fire in the bin (*Id.* at 222; 5/11 a.m. at 74).  Sumner did not believe that

there was an immediate potential for fire (5/10 p.m. at 229).  According to Sumner, he told

ConAgra that the bin was a "ticking time bomb" (*Id.*).  Friedt, Belcher, and Bindel denied that

Sumner made this statement (5/23 a.m. at 77: Friedt; 5/10 p.m. at 165: Bindel; 5/15 a.m. at 105: Belcher).  Assuming otherwise, Sumner explained his meaning:

> That referral was simply made to help them make a decision that they should probably do something about the bin because my experience is they don't get any better, they always seem to always get worse.  They don't get better (5/10 p.m. at 229; see also 237).

Sumner did not tell ConAgra to call the fire department (*Id.* at 230).  By the end of the meeting, ConAgra was ready to start remedial work early the next week (5/10 p.m. at 202: Sumner).  ConAgra's conduct showed a conscious regard for safety.

Following the meeting, Sean Belcher told Friedt that a ConAgra employee recommended Southern Illinois Salvage (SIS) as a potential contractor (5/23 a.m. at 76: Friedt; 5/15 a.m. at 41: Belcher).  Friedt decided to pursue SIS; after obtaining a quote from West Side, he put West Side on hold.  Even if Friedt should have been direct with Sumner, that is not the issue.  As plaintiffs admit, ConAgra was entitled to seek a lower quote (5/9 a.m. at 43: Clifford; 5/23 p.m. at 222: Taxman).  Given Sumner's admission that there was no immediate potential for fire, Friedt had time to search for a better deal.  Any negligent delay in not immediately hiring West Side did not support punitive damages.  *Loitz*, 138 Ill. 2d at 414 (errors in judgment insufficient).  Friedt's decision was not based on malice or a reckless disregard for the safety of anyone.

ConAgra promptly acted to retain SIS.  On March 22 or 23, SIS checked the bins (5/23 a.m. at 78-79: Friedt).  SIS did not indicate that the bin was on fire or would explode (*Id.* at 79).  ConAgra obtained a quote from SIS and wanted it to start immediately, but SIS could not meet ConAgra's insurance requirements (5/15 a.m. at 50: Belcher; 5/23 at 79: Friedt).  On April 3, ConAgra retained West Side with hope that West Side would start immediately (5/15 a.m. at 51: Belcher).  Unfortunately, West Side was unavailable for two weeks (5/23 a.m. at 83: Friedt).  Although ConAgra's decision-making process took time, there is no evidence that ConAgra was

22

indifferent to remediation (5/15 a.m. at 50-51: Belcher).  An error in judgment is not an

intentional and conscious disregard of a highly unreasonable risk of harm.

Prior to West Side's arrival, ConAgra took temperature readings of the bin's contents.

The temperatures fluctuated in the bins, and ConAgra did not report those temperatures to West

Side (5/11 p.m. at 137-38: Herring).  Assuming ConAgra's negligence, its conduct did not show

a conscious and intentional disregard of a highly unreasonable risk of harm.  After all, West Side

was the expert retained to remedy the problem.  West Side had earlier diagnosed the bin's

condition.  Upon West Side arrival on April 19, Flitch and crew were free to ask ConAgra

questions about the condition of the bin.  Sumner even "expected" that Flitsch would have done

so (5/11 a.m. at 23: Sumner).  Experts collect information; they ask questions.  There is no

evidence that West Side asked questions about temperatures or that Con Agra falsified readings.

As for the missing temperature records, there is no evidence that Con Agra intentionally

destroyed evidence in bad faith – the key element of spoliation.  *Miksis v. Howard*, 106 F. 3d

754, 762-63 (7th Cir. 1997); Sev. Cir. Inst. 1.20.  Flitch admitted that he could have asked

questions about the bin's condition prior to his arrival (5/24 p.m. at 119-20).  Flitch also admitted

that on April 20, he had "all the information [he] needed to do the job safely" (*Id*. at 120).  On

that day, he was "amazed at how clear the bin was" (*Id*. at 121).  There was no fire, smoldering,

embers, or smoke (*Id*. at 121-22).  The bin was "safe to do [West Side's] work" (*Id*. at 122).  For

seven straight days, West Side safely emptied the bin.  At best for plaintiffs, ConAgra's conduct

prior to West Side's arrival was a non-issue as to punitive damages.

Plaintiffs argue that on April 27, ConAgra ignored safety concerns and delayed

evacuating workers and calling the fire department.  Actually, ConAgra called the fire

department twice and arranged for a site visit (5/23 a.m. at 11-15: Lochhead).  Chief Lochhead

testified that because of scheduling conflicts, he and/or other fire fighters planned to visit the site at the end of the day (*Id.* at 13-14).  ConAgra may not be blamed for failing to insist on an earlier meeting.  As Schmidt admitted, he did not tell ConAgra on the morning of April 27 about the burning ember (5/17 p.m. at 129-30).  Neither did Flitch (5/24 p.m. at 158, 163: Flitch).  As for the second call, Lochhead testified that Friedt was "[e]xcited" and asked, "could you bring the fire department?"—including the trucks (5/23 a.m. at 14-15).  The explosion occurred during the second call (*Id.* at 14).  ConAgra's conduct did not meet the standard for awarding punitive damages.  It was entitled to rely on West Side's expertise in dealing with the problem.  As Friedt testified:

> I would say concerning the job that they were working on that they understood what they needed to get done.  They had the procedures, the process, the knowledge to do what we needed help with getting Bin 15 empty (5/23 p.m. at 218).

Friedt trusted Flitch, otherwise he "wouldn't have gone up on top of the bin [with Schmidt]…" (*Id.* at 218-19).  Flitch never told Friedt that West Side was fighting a fire inside the bin or that an evacuation was necessary (*Id.* at 219).  Trusting in a retained expert is not evidence of malicious or reckless behavior.

Flitch could have called the fire department and had a duty to do so (5/24 a.m. at 46-47: Schwers).  West Side's president testified: "I ***would expect*** that if he would need the fire department, that he would call the fire department" (*Id.* at 47; emphasis supplied).  Notably, the jury did not assess punitive damages against West Side for its failure to call the fire department.  That is proven by the jury's refusal to award punitive damages against West Side in Schmidt's case.  Because the jury did not punish West Side for the failure to call, it should not have punished ConAgra.

Plaintiffs claim that Bindel should have followed ConAgra's policy as to fire prevention and emergency evacuation (5/24 p.m. at 223: Taxman).  No one was hurt during Bindel's watch. Bindel admitted that he never saw a fire from March 12 to April 19 (5/10 p.m. at 166).  As Sumner testified, a fire must be observed to be confirmed (5/11 a.m. at 77-78).  Bindel had no experience with bin problems and was frustrated at the pace of remediation (5/10 p.m. at 146).  If anything, his frustration showed concern for safety.  He wrote "fire" in his e-mails because "[i]t's a word that catches people's attention" (*Id.* at 166).  That Bindel never saw a fire is unsurprising.  Neither Sumner nor Flitch (over five weeks later) saw a fire (5/10 p.m. at 222, 229: Sumner; 5/24 p.m. at 121-22: Flitch).  Even if Bindel failed to timely call the fire department and evacuate personnel, he did not demonstrate behavior punishable by punitive damages.

ConAgra employees were also concerned and apparently said so to ConAgra management.  But ConAgra's disagreement with their approach did not rise to the level of punishable misconduct.  Plaintiffs offered no evidence that the employees had the expertise or even competence to fix the bin.  ConAgra had a right to disagree with its employees on what was needed to solve the problem.  *Juarez*, 366 F.3d at 484.  Moreover, ConAgra was not indifferent to their concerns.  ConAgra had consulted with both West Side and SIS about the problem. Witness testimony as to ConAgra's alleged lack of concern was inadmissible.  *Juarez*, 366 F. 3d at 484 n.4; FRE 602.  There is no evidence that ConAgra told the employees that it was unconcerned.  In fact, Richard Lohmann testified that Friedt told him: "Well, we'll take care of it" (5/11 p.m. at 184-85).  ConAgra might have been guilty of mishandling employee relations, but of nothing punishable by punitive damages.

Plaintiffs note the testimony that Anthony Yount had "two lifetimes" to go to the scene and stop the work (5/24 p.m. at 223: Taxman).  Yount's failure to go to Chester did not constitute negligence.  Friedt was already there.  As for not stopping the job, Yount was negligent at worst—if that.  West Side did not call for an evacuation until minutes before the explosion.  Yount was entitled to rely on West Side's expertise.

Ultimately, ConAgra's lack of a quasi-criminal mindset is supported by the fact that the safety interests of plaintiffs and ConAgra were aligned.  In *Parks v. Wells Fargo Home Mortgage, Inc*., 398 F.3d 937 (7th Cir. 2005), plaintiff homeowners sued their lender for failure to timely pay real estate taxes.  The lender's failure nearly resulted in the loss of plaintiffs' home.  A jury awarded punitive damages.  The district court remitted a large amount; the Seventh Circuit vacated the entire punitive award.  Because the lender had given a mortgage secured by the property, any loss to the homeowners would have been a loss of security to the lender.  "Any reckless indifference Norwest exhibited towards the Parkes would have been equally detrimental to its own ability to rely on the property as security for the repayment of the mortgage."  *Id*. at 942.  The risk of loss to the lender "provided ample incentive to Norwest to put measures in place to prevent this type of occurrence."  *Id*. at 943.  Norwood had a proper system in place, and the system failure "does not mean that punishment is appropriate."  *Id*.

The potential for profits can motive safety, and from a purely business perspective ConAgra had an incentive to not be reckless.  ConAgra had sunk money not only into the contents of the bin but also into the bin itself.  As found by the jury, the explosion resulted in $3 million in bin repair costs.  The bin (maybe others, too) was out of use while being repaired.  Business operations at the site were likely disrupted for a significant time.  An explosion in the bin had the potential to damage the entire honeycombed bin structure.  ConAgra's insistence on

contractor insurance shows its recognition of the high costs that could result from unsafe work. ConAgra had work rules and evacuation plans in place at the time of the accident. Assuming that ConAgra failed to properly implement them, the failure did not mean that punitive damages were appropriate.

Illinois law provides that before a jury may award punitive damages, it must believe that "justice and the public good ***require***" them. IPI 35.01. The word "require" is much stronger than "justify" or "support." Under Illinois law, " 'punitive damages are never awarded as a matter of right. * * * [N]o matter how egregious the defendant's conduct may be, the jury is never obligated to assess punitive damages.' " *Crittenden v. Cook County Commission on Human Rights*, 2012 IL App (1st) 112437, 2012 WL 1971331. The language of the instruction tells a jury that it must find more than willful and wanton misconduct. The language expresses an additional element that must be satisfied. ConAgra tendered special interrogatories as to this element, but the Court refused them (5/25 p.m. at 92-93).

On a Rule 50(a) motion, a court acts as the gatekeeper of jury deliberations. Absent legally sufficient evidence, a case may not be submitted to a jury. This Court must determine whether the full Illinois punitive damages standard has been met. This includes the justice-and-public-good requirement. See *Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1295 (7th Cir. 1987) (language too vague for jury). There was no legally sufficient evidence for the jury to have believed that justice and the public good "require[d]" punitive damages. There is no evidence of aggravating circumstances so bad that punitive damages were required. There is not even sufficient evidence that an award of punitive damages could be justified or supported.

Indeed, if Illinois law allowed the imposition of punitive damages under the circumstances of this case—which it does not—it would violate federal due process. The U.S.

Supreme Court has held that due process allows the imposition of punitive damages in civil cases largely by reference to the historical pedigree of such damages. *See, e.g.*, *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 17-18 (1991). At common law, however, punitive damages were reserved for the most extreme and wanton misconduct. If Illinois law were interpreted to allow punitive damages on the facts of this case, that law would deviate materially from the historical norm and the imposition of punitive damages here would violate due process. *See, e.g.*, *Honda Motor Corp. v. Oberg*, 512 U.S. 415, 420-34 (1994). In addition, ConAgra did not receive fair and constitutionally adequate notice that its conduct here could subject it to an award of punitive damages. *See, e.g.*, *Philip Morris USA v. Williams*, 549 U.S. 346, 352-55 (2007); *see also BMW v. North Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice … of the conduct that will subject him to punishment … .").

### 2.   The clear and convincing evidence standard applies.

ConAgra is entitled to JMOL regardless of whether the availability of punitive damages in Illinois must be established by the preponderance of the evidence or the clear and convincing evidence standard. As explained in further detail below in connection with ConAgra's alternative request for a new trial, the latter standard should be applied. Under that standard, ConAgra's right to JMOL is even clearer.

### C.   ConAgra/West Side's claims

Because ConAgra is entitled to JMOL against plaintiffs, ConAgra's contribution claims are moot, and it is entitled to JMOL as to West Side's contribution claims. ConAgra is also entitled to JMOL on its negligence claim for property damages and on its indemnity claim. A trial is not needed as to those claims because the jury has already found West Side liable for

breach of contract.  The only remaining issue is the amount of attorney's fees and costs to which ConAgra is entitled.

## II.      ConAgra Is Entitled To A New Trial On Liability And Damages.

1.       The judgment for plaintiffs and against ConAgra as to liability for compensatory damages is against the manifest weight of the evidence.  ConAgra did not owe a duty of care.  It was not at fault, nor was it a proximate cause of plaintiffs' injuries.  ConAgra incorporates here the arguments in ConAgra's JMOL motion as to duty, breach of duty, and proximate cause.

2.       The judgment for plaintiff s and against ConAgra as to liability for punitive damages is against the manifest weight of the evidence.  ConAgra incorporates here its JMOL arguments on punitive damages.

3.       The jury's findings of contributory negligence as to Schmidt (0%), Jentz (1%), and Becker (5%) are against the manifest weight of the evidence.  As discussed above, Schmidt was fighting a fire for hours without contacting ConAgra or calling the fire department.  Becker and Jentz returned to the tunnel even after they were evacuated from the work area.  Moreover, Jentz and Becker were aware in the morning of April 27 that hot embers were coming out of the chute in the area under the bin (5/17 p.m. at 120-21: Schmidt).  And Becker admitted that he had been taught all of his life not to go into a building that is on fire (5/16 p.m. at 106).

4.       The allocations of fault as between ConAgra and West Side [*Becker*: 51% (ConAgra)/44% (West Side); *Jentz*: 54% (ConAgra)/45% (West Side); *Schmidt*: 65% (ConAgra)/35% (West Side)] are against the manifest weight of the evidence.  Prior to West Side's arrival, the bin had not exploded.  Flitch testified that on April 20, he did not see fire in the bin.  For seven days West Side safely removed pellets.  The explosion occurred because for hours prior to the explosion West Side was fighting the fire without telling ConAgra and without

contacting the fire department.  The injuries to Becker and Jentz occurred because Flitch sent

them into the tunnel after Schmidt had already called for an evacuation and Becker and Jentz

were in a position of safety.  ConAgra incorporates here its JMOL arguments on liability.

5.     The Court erred by denying ConAgra's request for a limiting instruction as to the

evidence of ConAgra's conduct prior to the start of West Side's work on April 19.  In *Board of*

*Trustees of Community College District No. 508 v. Coopers & Lybrand*, 208 Ill. 2d 259, 270-71,

the Court ruled that in cases involving the negative rendition of service, a factfinder must not

consider as negligent a plaintiff's conduct creating the condition for which a service provider is

employed to remedy.  Here, ConAgra's conduct prior to April 19 merely set the stage for West

Side's work.  The inadmissible evidence as to fault likely contributed to the finding of liability

against ConAgra and to the inappropriate allocation of fault to ConAgra.

6.     The Court erred by denying ConAgra's motion for judgment as a matter of law

that there is a written and valid contract between ConAgra and West Side by which West Side

waived its *Kotecki* protection (Doc. 503 at 14).  The court also erred by ruling that West Side did

not waive its *Kotecki* protection (Doc. 503 at 9-14).

7.     The Court erred by refusing ConAgra Instructions No. 24, 99, and 100 (5/25 p.m.

at 94, 96, 97).  The clear and convincing evidence standard was appropriate and required by due

process.  The Illinois Supreme Court has not discussed whether the clear and convincing

evidence burden applies to a consideration of punitive damages.  Cases about 150 years old

generally mention a believe-from-the-evidence standard but do not address the issue presented

here.  *Hawk v. Ridgeway*, 33 Ill. 473, 475 (1864); *Foote v. Nichols*, 28 Ill. 486 (1862); *Peoria*

*Bridge Ass'n v. Loomis*, 20 Ill. 236, 250-51 (1858).  The appellate court has not resolved the

issue, though the Fifth District accepted a clear-and-convincing- evidence instruction in a

product liability case. *Jablonski v. Ford Motor Co.*, 398 Ill. App. 3d 222, 923 N.E.2d 347 (5th

Dist., 2010), *rev'd on other grounds*, 2011 IL 110196, 955 N.E.2d 1138 (2011).  The Seventh

Circuit has not spoken on the issue.

In *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 191, 835 N.E.2d 801 (2005),

the Court stated:

> In the ordinary civil case, ***because there are no sound reasons for
> favoring one party over another***, the party with the burden of
> persuasion must prove his or her case by a preponderance of the
> evidence.  A proposition proven by a preponderance of the
> evidence is one that has been found to be more probably true than
> not true.  Occasionally, however, ***policy considerations*** require a
> court to impose a higher standard of proof.  In such a case, the
> party with the burden of persuasion must prove his or her case by
> clear and convincing evidence (emphasis supplied).

As to punitive damages, there are sound reasons and policy considerations for favoring one party

over another.  Punitive damages are "penal" in nature and "not favored in the law." *Loitz v.*

*Remington Arms Co.*, 138 Ill. 2d 404, 415, 563 N.E.2d 397 (1990).  An award is similar to a

"criminal penalty." *Kohlmeier v. Shelter Ins. Co.*, 170 Ill. App. 3d 643, 658, 523 N.E.2d 94 (5th

Dist., 1988).  Punitive damages are intended to address conduct so outrageous as to be "similar

to that usually found in crime." *Loitz* at 415.

Punitive damages are so disfavored that they are sometimes barred.  745 ILCS 10/2-106

(local public entities/public officials); 735 ILCS 5/2-1115 (medical/legal/healing art

malpractice); *Mattyasovsky v. West Towns Bus Co.*, 61 Ill. 2d 31, 36-37, 330 N.E.2d 509 (1975)

(Wrongful Death Act); *Froud v. Celotex Corp.*, 98 Ill. 2d 324, 335, 456 N.E.2d 1131 (1983)

(Survival Act).  Within the last 20 years, the Illinois General Assembly adopted a clear and

convincing evidence standard as part of tort-reform legislation.  735 ILCS 5/2-115.05 (b).  The

legislation was held unconstitutional without comment on the standard.  *Best v. Taylor Machine*

*Works*, 179 Ill. 2d 367, 689 N.E.2d 1057 (1997). Although the standard has not been re-enacted, the explanation is more likely political than legal.

The Seventh Circuit has stated that "Illinois courts take a rather dim view of punitive damages… ." *Williams v. Jader Fuel Co.*, 944 F. 2d 1388, 1396 (7th Cir. 1991); *Medcom Holding Co., v. Baxter Travenol Laboratories, Inc*., 106 F. 3d 1388, 1402 (7th Cir., 1997) (same). Because punitive damages are not favored, courts " 'must take caution to see that punitive damages are not improperly or unwisely awarded.' " *Slovinski v. Elliot*, 237 Ill. 2d 51, 58, 927 N.E.2d 1221 (2010). Caution is best served by a heightened burden of proof. The higher burden has become "an important check against unwarranted imposition of punitive damages." *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 433, 114 S.Ct. 2331, 2341 (1994).

Applying the higher burden of proof is consistent with its required use in fraud cases, where punitive damages are allowed. *Avery*, 216 Ill. 2d at 191; IPI 35.01. In a fraud case, a plaintiff must prove that a statement was known or believed to be false or was made with reckless disregard for its truth—a standard similar to the willful-and-wanton standard. *Gerill Corp. v. J.L. Hargrove Builders*, 128 Ill. 2d 179, 193, 538 N.E.2d 530 (1989); *Ziarko v. Soo Line R.R.*, 161 Ill. 2d 267, 273-74, 741 N.E.2d 402 (1994). There is no reason for applying different burdens of proof. Moreover, a willful and wanton misconduct standard may be used to support a claim for compensatory damages. *Ziarko* at 276. Punitive damages require conduct above and beyond the conduct needed for an underlying claim. *Petty v. Chrysler Corp.*, 343 Ill. App. 3d 815, 828, 799 N.E.2d 432 (1st Dist., 2003); *Canel & Hale, Ltd. v. Tobin*, 304 Ill. App. 3d 906, 920, 710 N.E.2d 861 (1st Dist. 1999). Applying the clear and convincing evidence standard appropriately raises the level of proof needed to support punitive damages.

Additionally, Illinois would likely follow the lead of its sister states.  Whether by case law or statute, 32 states and the District of Columbia require proof of punitive damages by clear and convincing evidence (Ex. 2).  This number is more impressive given that six other states bar punitive damages, restrict them to statutory actions, or apply a beyond-a-reasonable-doubt standard (*Id.*).  Applying the clear and convincing standard puts Illinois in the mainstream.

Furthermore, the failure to apply the clear and convincing standard violates constitutional due process.  In *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23 n. 11, 111 S.Ct. 1032 (1991), the Court included a footnote arguably rejecting ConAgra's due process position:

> We have considered the arguments raised by Pacific Mutual and some of its *amici* as to the constitutional necessity of imposing a standard of proof of punitive damages higher than "a preponderance of the evidence."  There is much to be said in favor of a State's requiring, as many do, see *e.g.* Ohio Rev. Code Ann. §2307.80 (Supp. 1989), a standard of "clear and convincing evidence" or, even, "beyond a reasonable doubt," see Colo. Rev. Stat. §13-25-127(2) (1987), as in the criminal context.  We are not persuaded, however, that the Due Process Clause requires that much.  We feel that the lesser standard prevailing in Alabama – "reasonably satisfied from the evidence" – when buttressed, as it is, by the procedural and substantive protections outlined above, is constitutionally sufficient.

Although *Haslip* is relatively recent, the Supreme Court has reconsidered even recent rulings.  See *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183 (2005) (abrogating 1981 ruling as to death penalty for juveniles).

Following *Haslip*, the Court has continued to recognize the constitutional dimensions of the punitive damages issue in light of skyrocketing awards.  See *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513 (2003) (excessiveness); *BMW of North America, Inc.*, v. Gore, 715 U.S. 559, 116 S.Ct. 1589 (1996) (same).  "Punitive damages pose an acute danger of arbitrary deprivation of property."  *Honda*, 512 U.S. at 432 (1994).  In *Honda*, the Court

recognized that the clear and convincing standard "is an important check against unwarranted imposition of punitive damages." *Id.* at 433.

This is particularly true given the recognized weakness in the preponderance standard:

> "[T]he preponderance test is susceptible to the misinterpretation that it calls on the trier of fact merely to perform an abstract weighing of the evidence in order to determine which side produced the greater quantum, without regard to its effect in convincing his mind of the truth of the proposition asserted."

*In re Winship*, 397 U.S. 358, 367-68, 90 S.Ct. 1068 (1970) (requiring beyond-the-reasonable-doubt standard in juvenile delinquency hearings). That was the case here. During closing arguments, the Beckers' counsel stated that the Beckers proved their claims if they tipped the scales merely by the weight of a "feather" (5/29 a.m. at 79: Taxman). His comment told the jury that the preponderance test is viewed as a weight test. The weakness of the preponderance test is why due process requires a higher standard as stakes rise. The clear and convincing evidence standard is required in civil deportation proceedings given the potential for " 'drastic deprivations.' " *Winship*, 397 U.S. at 368 n. 6. No individual should be "banished from this country upon no higher degree of proof than applies in a negligence case." *Id.* The higher standard also applies to civil commitments. *Addington v. Texas*, 441 U.S. 418, 424, 99 S.C. 1804 (1979). Here, the verdict revealed the "devastating potential for harm" by the inappropriate award of punitive damages. *State Farm*, 538 U.S. at 417. And with it comes a "stigma." *Haslip*, 499 U.S. at 54 (O'Connor, J., *dissenting*). A higher standard minimizes these problems.

In *Haslip*, the Court noted that many states impose a higher standard of proof in punitive damages cases. 499 U.S. at 23 n.11. As shown in Exhibit 2, these states comprise a solid majority. Consideration of a national consensus is an element of a due process analysis. *Washington v. Glucksberg*, 521 U.S. 708, 711, 117 S.C. 2258 (1997) (physician-assisted

suicide); *Roper*, 543 U.S. at 564-67. A national consensus favors the use of the heightened standard.

Because the Court applied the wrong burden, ConAgra is entitled to a new trial. The jury likely would have found that plaintiffs could not meet the higher burden.

## B.   ConAgra Is Entitled To A New Trial On Damages.

## 1.   ConAgra is entitled to a new trial on non-economic compensatory damages.

The question of whether damages are excessive is governed by Illinois law. *Smart Marketing Group, Inc. v. Publications Int'l Ltd.*, 624 F.3d 824 (7th Cir. 2010). An award of damages is excessive if it "falls outside of the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience." *Richardson v. Chapman*, 175 Ill. 2d 98, 113, 676 N.E.2d 621 (1997) (reducing two verdicts by combined $1.05 million). Here, the injuries to plaintiffs were real and significant, and ConAgra does not minimize them. ConAgra does not take issue with the awards of past and future economic damages. But the awards of non-economic damages are excessive. ConAgra is entitled to a new trial as to non-economic compensatory damages.

There is no need to repeat the evidence as to plaintiffs' injuries, treatments, and prognosis. The issue is whether the awards are justifiable. Without reduction for comparative fault, the jury awarded:

| Category | Becker | Jentz | Schmidt |
|---|---|---|---|
| Disfigurement | $10 million | $20 million | $500,000 |
| Loss of Normal Life (Past) | $1 million | $750,000 | N/A |
| Loss of Normal Life (Future) | $8 million | $8 million | N/A |
| Increased Risk of Harm | N/A | $1 million | N/A |

| | | | |
|---|---|---|---|
| Pain & Suffering (Past) | $2 million | $5 million | $250,000 |
| Pain & Suffering (Future) | $4 million | $1 million | $100,000 |
| Emotional Distress (Past) | $2 million | $1.5 million | $1.5 million |
| Emotional Distress (Future) | $5 million | $750,000 | $500,000 |
| **Total Non-Economic** | **$32 million** | **$38 million** | **$2.85 million** |
| **Total Economic** | **$3.39 million** | **$3.585 million** | **$65,000** |
| **Total Award** | **$35.39 million** | **$41,169, 150** | **$2.915 million** |

The ratios of non-economic damages/economic damages are: Becker (10.44:1), Jentz (11.43:1), and Schmidt (44.8:1).  The non-economic awards are excessive.

Although Illinois courts disfavor a comparison of awards, in diversity cases the Seventh Circuit applies a different rule.  In *Arpin v. United States*, 521 F. 3d 767 (7th Cir. 2008), plaintiff brought a wrongful-death medical malpractice action under the Federal Tort Claims Act.  The Act applies state substantive law.  Following a bench trial, the court awarded over $8 million, including $750,000 for pain and suffering and $7 million for loss of consortium.  The Seventh Circuit vacated the consortium award.  It stated that a comparison of awards is appropriate:

> The judge should have considered awards in similar cases, both in Illinois and elsewhere.  It is true that the Supreme Court of Illinois does not require or encourage such comparisons.  *E.g.  Richardson v. Chapman supra*, 221 Ill. Dec. 818, 676 N.E.2d at 628; *Velarde v. Illinois Central R.R. supra*, 289 Ill. Dec. 529, 820 N.E.2d at 55-56; *Epping v. Commonwealth Edison Co.*, 315 Ill. App. 3d 1069, 248 Ill. Dec. 625, 734 N.E.2d 916, 918-19 (2000).  It is also true, though denied by the United States, that in a suit under the Federal Tort Claims Act, as in a diversity suit, the damage rules of the state whose law governs the substantive issues of case bind the federal court; damages is substantive law.  But whether or not to permit comparison evidence in determining the amount of damages to award in a particular case *is a matter of procedure rather than of substance*, as it has no inherent tendency (as does a rule requiring

36

> heightened review of damage awards for challenges as excessive, as in *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 116 S. Ct. 2211, 135 IL Ed. 2nd 659 (1996)) either to increase or decrease the average damages award; the tendency is merely to reduce variance.  The policy of permitting such comparison evidence as suggested above, on the requirement in Fed. R. Civ. P. 52 (a) that judges explain their reasoning.  Rule 52 (a) is of course a rule of procedure, rather than anything to do with how stingy or generous damage awards should be.
>
> And so in *Jutzi-Johnson v. United States, supra* 263 F. 3d at 759-60, we rule that Illinois' rule on comparison and damages cases does not bind the federal courts even in cases such as this where the rule of decision is given by Illinois law.  A later decision of this court, without citing *Jutzi-Johnson* – nor had the parties cited to the court – contains dicta to the effect that the rule does not bind the federal courts.  The court nevertheless upheld a district judge's refusal to set aside the jury's award even though the judge had based his ruling in part, on a comparison with the words in like cases.  *Naeem v. McKesson Drug Co.*, 444 F. 3d 593, 611-12 (7th Cir. 2006).

*Id.* at 776-77 (emphasis supplied).  District courts have used the comparison approach.

*Maldonado v. Sinai Med. Group, Inc.*, 706 F. Supp. 2d 882, 888 n.7 (N.D. Ill. 2010) (citing

*Arpin*); *Knierim v. United States Gov't Dep't of the Navy*, 802 F. Supp. 2d 965, 979 (S.D. Ind.

2011) (same).

 As compared to verdicts in other burn cases, the awards here are excessive.  Attached as

Exhibit 3 are jury verdict reports in recent burn cases.  They reveal a range of verdicts between

$1,078,600 - $10,200,000.  In *Heastie* (7/22/09 – Cook County), a 41-year old man sustained

third degree burns over 22% of his body, plus amputations of his entire right thumb and

forefinger, and amputations of most of his second, third and fourth fingers.  The index finger was

surgically reattached to the thumb.  The jury awarded $1,078,600.  In *Carter* (1/24/07 – Cook

County), a jury awarded $2,935,650 to a 50-year old man for second and third degree burns over

21% of his body, primarily his torso, requiring skin grafts.  He has scars on his hands, arms and

large areas of his back and chest, as well as skin graft harvests from his legs and thighs.  In

*Thakore*, (12/6/10 - N.D. Ill), a 47-year old woman sustained severe burns to her hand requiring four reconstructive surgeries and leaving her with limited use of her right hand.  The jury awarded $3,338,338.  In *Tellez* (10/18/11 – Cook County), the jury awarded $10.2 million to a 17-year old girl who sustained burns over 35% of her body with second and third degree burns to her hands, arms, shoulders, back, chest, and part of her face.  Even accounting for factual differences, the awards in these cases fell well below the awards here.

In determining excessiveness, this Court must consider the severity of plaintiffs' injuries in relation to other injuries.  Here, plaintiffs suffered significant injuries, but they can walk, talk, and cognitively function.  They have their limbs.  They can see, taste, hear, smell, and feel.  They can independently perform all activities of daily living.  So plaintiffs' awards must be compared to awards given to other injury victims unable to do what plaintiffs can still do.

Attached as Exhibit 4 are reports of recent Illinois verdicts in catastrophic injury cases.  The following summarizes the highest of them:

| Case | Date | Venue | Amount | Injuries |
|------|------|-------|--------|----------|
| *Baldwin* | 3/4/09 | Lake | $33,210,919 | M-19; paralysis from chest down, destroyed pituitary gland affecting temperature regulation and hormone production, 20 pills/daily |
| *Schulte* | 3/25/10 | Rock Island | $33,000,000 | M-19; massive degloving injury to upper thighs and lower abdomen, fractures to both legs and multiple areas of pelvis, surgical amputation of both legs, one at the hip, the other re-attached by rotation plasty |
| *Velarde* | 2/8/02 | Cook | $30,905,000 | F-39; traumatic brain injury, cognitive deficits, mental capacity of 9-year old, major depression, PTSD |
| *Bringas* | 12/21/09 | N.D. IL | $30,240,058 | M-newborn; brain damage, cerebral palsy with partial paralysis of arms and legs |

| | | | | |
|---|---|---|---|---|
| *Poppel* | 2/27/09 | Cook | $29,560,081 | F-25; traumatic brain injury (TBI), skull fracture, loss of cognitive function, severely impaired speech, legally blind, ataxia, wheelchair bound, inability to use left hand/arm, fractures to pelvis, C1-2 spine, right ulna and humerus, loss of use of right hand, 13 weeks pregnant with healthy baby born |
| *Arroyo* | 4/2/10 | N.D. IL | $29,159,535.37 | Newborn; spastic quadriplegia with cerebral palsy |
| *Thompson* | 9/30/92 | Cook | $29,154,125 | M-8; amputation of both legs (left at hip, right below knee) |
| *Eichhorn* | 12/5/07 | Cook | $25,713,426 | M-51; traumatic amputation of right leg below knee requiring surgical amputation above knee and dis-articulation at hip, L-2 spinal cord damage resulting in paraplegia and spinal fusion surgery, crushed left leg with nerve and muscle damage requiring fixation, numerous decubitive ulcers, intractable chronic pain requiring heavy doses of narcotic substantially stronger than morphine, can walk short distances with help, drives modified van, permanently disabled from work |
| *Chraca* | 9/8/09 | Cook | $25,093,335 | M-32; T-12 burst fracture with incomplete paraplegia, can only walk short distances with leg braces, canes, or walker |
| *White* | 9/29/09 | Cook | $25,044,370 | M-newborn; severe brain damage, cerebral palsy, spastic quadriplegia, needs continuous medical care and unable to live independently |
| *Liberato* | 9/19/08 | Cook | $25,040,859 | M-newborn; hypoxic ischemic encephalopathy resulting in cerebral palsy, spastic quadriplegia, mental retardation, feeding through gastrostomy tube |
| *Hoffman* | 2/10/12 | Cook | $24,550,000 | F-50; permanent paraplegia w/no use of legs, blow-out fracture of left orbital floor, sub-arachnoid hemorrhage, vision impairment, loss of bowel and bladder function, rods to stabilize spine, permanent |

|  |  |  |  | colostomy and super pubic bladder catheter |
|---|---|---|---|---|
| *Porter* | 2/14/08 | LaSalle | $23,737,234 | M-28; cardiac arrest, anoxic encephalopathy with permanent spastic quadriparesis, double vision and slurred speech, confined to wheelchair |
| *Palenik* | 2/27/07 | N.D. IL | $23,564,606 | F-25; severe TBI, brain damage, spastic quadriplegia, cognitive dysfunction, confined to wheelchair or bed, complete disability and total dependence on others for care, must be fed through tube, cannot verbalize, has no purposeful movement, minimally conscious, bilateral lung contusions, bilateral pneumothoraxes, fractures of ribs (bilateral), left clavicle, pelvis, open right distal tibia and fibula, closed right humurus |
| *Diaz* | 10/21/11 | Cook | $23,000,000 | M-47; catastrophic C5-6 injury with permanent tetraplegia with limited use of upper extremities, two surgeries to stabilize spine, permanent gastrostomy and tracheostomy tubes, surgery for large decubitus ulcers, 24/7 LPN care needed with lifetime physical and occupational therapy |
| *Tinman* | 11/23/09 | Cook | $22,327,241 | M-newborn; amputation of left leg above knee, stroke with prolonged hypoxia affecting right arm and leg, global developmental delay, conjunctive defects, I.Q. of 58 |
| *McCloud* | 8/24/07 | C.D. IL | $15,000,000 | F-38; brain injuries, cognitive deficits, partial paralysis |
| *Hayes* | 10/2/01 | DuPage | $12,000,000 | M-newborn; hypoxic ischemic brain injury, manifested as spastic quadriplegia cerebral palsy, permanently wheelchair bound, wears abdominal binder for easier breathing, permanent gastro-esophageal reflux disease, needs G-tube for feeding, normal life expectancy but unemployable |
| *Gordon* | 10/27/05 | Cook | $11,433,190 | F-21; brain damage with hemiparesis, cognitive deficits, severe ataxia, dysarthria, |

| | | | | dysmetria, dystonia, double vision, right arm tremors, right tibiofibular fractures, left knee derangement, erosive gastritis, lower extremity spasticity, hyporedflexia of knee and ankle, swallowing and speech difficulties, short-term memory deficits, depression, emotional problems and disability |
|---|---|---|---|---|
| *Burden* | 11/10/10 | S.D. IL | $9,000,000 | M-51; fractured leg, cervical spine injury requiring surgery at three disc levels, low back injury, TBI with short-term memory loss, unable to work and totally unemployable |
| *Gladney* | 1/31/03 | Cook | $7,324,891 | F-9; TBI with cognitive deficits and emotional changes |
| *Thompson* | 5/25/06 | Cook | $7,000,000 | M-4; TBI and diminished mental functions leaving him unable to be gainfully employed |

Other verdicts are included within Exhibit 4. Again, accounting for factual differences the verdicts here are out of line with the verdicts in the reported cases.

So are the individual line items on the verdicts. The $20 million disfigurement award to Jentz is twice as high as the highest Illinois disfigurement amount that ConAgra has found (Ex. 4: $10 million – *Schulte*). The awards to all plaintiffs for loss of normal life and for pain and suffering are excessive compared to the awards involving more severe and debilitating injuries. The increased risk of harm awarded to Jentz is out of line with his actual risk.

As for the emotional distress awards, they should be vacated in their entirety. For over a century, Illinois law has recognized that an award for pain and suffering includes physical and mental pain and suffering. *Walsh v. Chicago Rys.*, 303 Ill. 339, 346-47, 135 N.E. 709 (1922); *Chicago Consolidated Traction Co. v. Schritter*, 222 Ill. 364, 367-68, 78 N.E. 820 (1906); *Cicero & P.S. Ry v. Brown*, 193 Ill. 274, 276-77, 61 N.E. 1093 (1901). Over ConAgra's objection, this

41

Court approved an instruction as to emotional distress (IPI 30.05.01). The instruction is intended for cases involving the negligent infliction of emotional distress in the absence of physical impact. See comments to IPI 30.05.01. *Babikian v. Murz*, 211 IL App (1st) 102579, 956 N.E.2d 959 (1st Dist. 2011), is distinguishable. The court did not address the Illinois Supreme Court decisions as to pain and suffering. Because there is no way here to determine the amount of overlap between the pain and suffering and emotional distress awards, the latter should be vacated.

The disfigurement awards are also internally inconsistent. Jentz was awarded $20 million for burns over 70-80% of his body. Becker was burned over 12-15% of his body and yet was awarded $10 million. Schmidt's burns were relatively minor and hardly visible. He was awarded $500,000.

Schmidt's overall damages were excessive. There was no medical evidence that Schmidt suffered from post-traumatic stress disorder or from an emotional condition that will be permanent or otherwise long-term. Yet Schmidt was awarded $600,000 for emotional injuries.

Amber Becker's $250,000 award is also excessive. She offered little evidence of her relationship with her husband, none of which justified the award.

The excessive awards are also explained by the passion and corruption brought against ConAgra. As previously discussed, the evidence did not warrant any award of punitive damages. But allowing the willful and wanton conduct claim permitted plaintiffs to put ConAgra in a bad light, and that likely boosted the awards of compensatory damages. In *Verni v. Harry M. Stevens, Inc.*, 387 N.J. Super. 160, 903 A.2d 475 (2006), the appellate division reversed compensatory awards of over $60 million and punitive awards of $75 million. Plaintiffs claimed that defendants over-served a fan at a New York Giants football game. The trial judge

42

erroneously admitted evidence of a "culture of intoxication" at the stadium, which unduly prejudiced the jury as to the over-service issue. *Id.* at 186, 903 A.2d at 490. Here, the legally insufficient willful and wanton misconduct claim unduly prejudiced the jury in its consideration of compensatory damages.

The unfair treatment of ConAgra was exacerbated during closing arguments. ConAgra's counsel commented on the work crew's decision to fight the fire in the bin:

> I think they just – call it over confidence, call it stupidity, certainly call it negligence, but they thought that they could beat that fire, and they're telling you, all the lawyers, that they're not qualified to fight fires and this is why. This is what happens when you're not qualified or competent to fight a fire. You make it worse. (5/29 p.m. at 211-12).

During rebuttal, Becker's counsel stated:

> He called Justin Becker stupid in this courtroom. He called him stupid. I told you that the person at the bottom of the chain of command who has their head down and working when they have to do something dangerous, they are going to call that person stupid. I said it in an argument and it came true this afternoon. Stupidity. He said those words. It came out of his mouth. That is uncalled for, uncalled for. How dare Justin Becker get burned at their facility. How dare he do that. That is rude, calling him names at the level that he is at here, $15 an hour. It is rude.
>
> That alone, calling him stupid, warrants your verdict for punitive damages. You tell them you can't do this. You can't make these decisions and call him stupid. It is not fair (5/29 p.m. at 241-42).

ConAgra objected to counsel's finger-pointing at defense counsel as "inappropriate in this courtroom" (*Id.* at 242). Becker's counsel continued:

> He called my client stupid.
>
> *** Not only did he call my client stupid, but he demeaned him and he demeaned his wife when he talked about their damages (*Id.* at 242-43).

ConAgra's counsel did not call anyone stupid, nor did he demean anyone. He stated that the entire work crew did a stupid thing. Intelligent people do stupid things. No one is immune, and everyone knows it. Becker's counsel unfairly twisted ConAgra's language in order to demonize ConAgra. The tactic likely inflated compensatory damages.

Additionally, a Jentz/Schmidt attorney commented during rebuttal on the conduct of ConAgra's counsel (5/30 a.m. at 27-29). ConAgra's counsel was not on trial. During trial there was no objection raised as to his conduct. Plaintiffs' comments were nothing less than an attempt to rain unfair prejudice down on ConAgra. It resulted in the excessive compensatory damages. ConAgra did not need to object to the improper closing argument to preserve a challenge to the excessive awards. *Panepinto v. Morrison Hotel, Inc*., 71 Ill. App. 2d 319, 336-37, 218 N.E.2d 880 (1st Dist. 1966).

Furthermore, the conduct of West Side wrongly added to the unfair passion and prejudice brought against ConAgra. Throughout the case, West Side joined with plaintiffs in blaming ConAgra for allowing the explosion to occur. The close alignment between plaintiffs and West Side cannot be denied. West Side did not challenge the compensatory damages claims made by plaintiffs. They asked virtually no questions as to plaintiff's damages. During closing argument they said nothing in response to requests for over $130 in compensatory damages (5/29 p.m. at 218-40). In *Chesler v. Trinity Industries, Inc*., 2001 WL 1593142 (N.D. Ill. 2001), the district court ordered a new trial based on a high-low agreement between plaintiffs and a third-party defendant announced while the jury was deliberating. The court noted that the third-party defendant "did nothing to minimize damages" and told the jury that defendant did not have a case as to limiting damages. *Id*. at *11. The third party-defendant also put on an "extremely limited defense" even though plaintiff sought over $20 million. *Id*.

Even worse, West Side suggested to the jury that ConAgra should be hit for punitive damages.  Notably, during ConAgra's closing argument ConAgra's counsel stated that neither ConAgra nor West Side should be hit with punitive damages (5/29 p.m. at 213).  However, West Side would not say the same, and West Side's counsel strongly suggested that ConAgra should be hit with punitives (5/29 p.m. at 239-40).  Counsel made comments against ConAgra that were totally unnecessary to fend off Schmidt and Jentz's punitive damages claim against West Side (*e.g.*, *Id.* at 240 ". . .one [defendant] was trying to help, one was placing money over safety all the way to the very end. . .").  By doing so West Side wrongly added fuel to the willful-and-wanton-misconduct fire.  It resulted in excessive compensatory damages.

The damage awards here are so large as to shock the judicial conscience.  The test is not a subjective one that that turns on how an individual judge feels about money awards.  The test must be objective, asking whether the awards fail to do justice to all parties before the court.  The evidence on non-economic damages does not bear a reasonable relationship to the injuries sustained by plaintiffs.  The awards do an injustice to ConAgra and so shock the judicial conscience.

## B.     ConAgra is entitled to a new trial on punitive damages.

Whether considered singly or in combination, the punitive damages awards are excessive and violate the federal due process clause.  In *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S. Ct. 1513 (2003), the Court applied a three-prong test for considering constitutional excessiveness:

> (1) the degree of reprehensibility of the defendant's misconduct;
> (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages awarded; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

Under these standards, the punitive damages awards are excessive.

The degree of reprehensibility of a defendant's conduct is the "most important indicium" of reasonableness.  *State Farm*, 538 U.S. at 419.  A court should consider whether:

> . . . the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of a conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. (citation omitted). The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; the absence of all of them renders any award suspect.  It should be presumed that a plaintiff has been made whole for his injuries by compensatory damages, ***so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence***.  *Id*. at 419 (emphasis supplied).

To uphold the awards here, this Court must rule that ConAgra's paying $77,560,650 will not achieve punishment or deterrence.  Absent that finding, the awards must fall in their entirety. There is no evidence that ConAgra has a past history of ignoring bin problems or that it continues to engage in the same conduct involved here.  The compensatory awards here, even if reduced for excessiveness, are more than sufficient to achieve punishment and deterrence— assuming either is necessary.

Under the *State Farm* factors, the punitive damages awards cannot stand.  As discussed, ConAgra did not engage in the type of conduct needed to support punitive damages.  The situation was isolated, not repetitive.  At best for plaintiffs, ConAgra was guilty of errors in judgment.  ConAgra had work safety policies in place to protect its employees and invitees. Assuming that ConAgra personnel lost sight of those policies, its conduct did not amount to a conscious and intentional disregard of a highly unreasonable risk of harm.  *Parks*, 398 F.3d at 943.

46

In considering reprehensibility, this Court must also consider the involvement of West Side. ConAgra hired West Side, an acknowledged expert, to safely remove the pellets. For seven days, it did so. The explosion did not occur because ConAgra was indifferent to safety. It occurred because West Side fought a fire for hours without calling the fire department. Moreover, the injuries to Becker and Jentz were not caused by ConAgra. As experts Ogle and Schroeder agree, they were caused by Flitch's decision to send the workers into the tunnel. The jury awarded punitive damages against West Side for that conduct.

As discussed regarding the compensatory damages, the alignment between plaintiffs and West Side also had a bearing on the award of punitive damages. They ganged up in trying to make ConAgra look evil. Certainly, West Side had no valid reason to push punitive damages onto ConAgra—but it did (5/29/p.m. at 239-40).

*State Farm* held that there is no bright line rule for considering the ratio between punitive and compensatory damages. 538 U.S. at 424-25. "Single-digit multipliers are more likely to comport with due process… ." *Id*. at 425. Here, the 11.43/1 ratio in the *Schmidt* case is constitutionally infirm. Given that Schmidt's compensatory damages are excessive, the ratio is even higher. The Schmidt punitive damages award must fall.

ConAgra is not aware of any civil or criminal penalty that would approach a $100 million fine for a single event. ConAgra is also unaware of any case in which a jury has awarded $100 million dollars in punitive damages for the type of conduct involved here.

The jury acted well beyond the *State Farm* factors. Assuming otherwise, the compensatory damages awards, even if reduced for excessiveness, were more than enough to punish and deter.

47

Finally, the punitive damages awards are excessive because they are duplicative. This Court allowed the jury to return three separate punitive damages verdicts for the same conduct, a violation of federal due process. *In BMW of North America, Inc. v. Gore*, 517 U.S. 559, 612 n.4, 116 S.Ct. 1589, 1617 (1996), the Court declined to decide whether multiple punitive damage awards for the same conduct violates due process (Ginsberg, J., *dissenting*). The issue is ripe now for review. The jury instruction did not tell the jury to consider amounts awarded to the separate plaintiffs. Moreover, the Court overruled ConAgra's objection that only one punitive damages award was constitutionally permissible (5/25 a.m. at 71).

In *State Farm*, the Court recognized the respective interests of those involved in the issue of punitive damages. A plaintiff has an interest in obtaining redress for injuries actually sustained. That interest is served by an award of compensatory damages. 530 U.S. at 416. A state has an interest in punishing unlawful conduct and deterring its repetition, an interest that can be served by a single award. *Id.* Illinois has authorized punitive damages, and its damages system was applied to this case. The interests of plaintiffs and Illinois have been served.

A defendant's interests must also be considered. A defendant has a property interest that is constitutionally protected through the due process clause. The clause "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id.* at 416. Such an award "furthers no legitimate purpose and constitutes an arbitrary depravation of property." *Id.* at 417. Because the interests of plaintiffs and the State have already been served, the only remaining consideration is ConAgra's interest.

The Court's procedure of allowing three separate punitive damage awards violated due process. At issue in each case was exactly the same conduct by ConAgra. But the jury was allowed to award punitive damages as if only one case was filed. It was not told to consider the

48

amounts awarded to the other plaintiffs when awarding damages to a particular plaintiff.  IPI

35.01.  So ConAgra was punished three times for the same conduct.  This is a due process

violation.

The number of persons injured by a defendant's conduct does not constitutionally justify

a separate punitive damages award for each injured person.  Certainly, the number of persons

harmed in a single incident is a factor that a jury may consider in rendering a single award.

Here, a jury conceivably could have awarded more than $33.33 million but far less than $100

million had it factored three plaintiffs into its analysis.  But by allowing three separate awards,

the Court effectively treated ConAgra as having committed three separate reprehensible acts.

The ruling unfairly resulted in three separate punishments for, in reality, only one act.

This Court ruled that because plaintiffs filed separate cases they should be entitled to

separate punitive awards (5/25 a.m. at 72).  Due process is all about protecting a defendant's

property interests from arbitrary deprivation.  Providing separate punitive damages for each

plaintiff merely creates more "windfall" rather than protecting a defendant's constitutional rights.

*Mattyasovsky v. West Towns Bus Co.*, 61 Ill. 2d 31, 37, 330 N.E.2d 509 (1975) ("windfall for the

plaintiff"); *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1044 (7th Cir.

1990) ("windfall").  Due process is not concerned with equalizing windfalls but only with

preventing an arbitrary deprivation of property.  Besides, Illinois law allows a court to allocate a

punitive damages award between a plaintiff, his attorney, and the Illinois Department of Human

Services.  735 ILCS 5/2-1207.  The statute allows a court to consider all relevant factors, which

should include the circumstances of consolidated cases.  But even where cases have not been

consolidated, a defendant is still entitled to constitutional protection.  In the non-consolidated

cases, a defendant should be entitled to a set-off or should be allowed to offer evidence of

punitive damage judgments for the same conduct.  Here, nothing required the jury to consider the totality of the awards.

Contrary to Schmidt's argument, it was unnecessary to have separate awards in order to perform a proportionality analysis (5/25 a.m. at 71-72).  Because only one punitive award should have been entered, the award would be compared against the aggregate of plaintiffs' compensatory damages awards.  This method would tend to protect plaintiffs who, like Schmidt, received lower amounts of compensatory damages.  At the same time, it protects a defendant from an excessive award of punitive damages.

The Court suggested that multiple orders were appropriate because the case involved multiple defendants (5/25 a.m. at 72-73).  There is no problem with providing separate awards as to individual defendants.  The problem arises when multiple awards are entered against one defendant for the same conduct.

The Court stated that policy considerations are not as persuasive here as in asbestos cases that involved millions of plaintiffs.  (5/25 a.m. at 73).  But from a constitutional perspective, the number of plaintiffs is irrelevant.  The issue is whether a defendant has been arbitrarily deprived of its property.  An unconstitutional deprivation involving just a few plaintiffs is still an unconstitutional deprivation.

*In re Brand Name Prescription Drug Anti-Trust Litigation*, 123 F.3d 599 (7th Cir. 1997), does not control the analysis.  Although the Court stated that punitive damage is an individual rather than a collective entitlement, it recognizes that this rule might need to be qualified in light of *BMW*.  *Id*. at 609.  The Court left open for consideration whether "a piling on of awards by different courts for the same act might result in excessive punishment for that act."  *Id*.  For due

process purposes this case is treated as three separate cases, and ConAgra was punished three times for the same conduct.

The punitive damage awards are excessive and should be vacated.

### III.   ConAgra Is Entitled, At the Very Least, To Remittiturs.

Under Illinois law, a court is authorized to remit excessive damages award.  *Richardson v. Chapman*, 175 Ill. 2d 98, 676 N.E.2d 621 (1997) (compensatory damages).  *Slovinski v. Elliot*, 237 Ill. 2d 51, 927 N.E.2d 1221 (2010) (punitive damages).  Federal law also allows for remittitur.  See *Parks v. Wells Fargo Home Mortgage, Inc.*, 398 F. 3d 937, 940 (7th Cir. 2005).  For the above reasons, the compensatory and punitive damages awards are excessive and should be vacated.  Without waiving its liability arguments, ConAgra alternatively requests remittiturs to the following amounts: Justin Becker ($8 million compensatory and $0 punitive); John Jentz ($12 million compensatory and $0 punitive); and Robert Schmidt ($750,000 compensatory and $0 punitive).

Three further comments are appropriate.  ConAgra has not made a remittitur request as to Amber Becker.  Assuming her derivative judgment survives, she received a pretrial settlement from A&J in excess of the jury award.  She is not entitled to more.

ConAgra requests remittiturs bringing the punitive awards to $0.  *State Farm* holds that punitive damages should not be awarded when the size of the compensatory awards is sufficient to achieve punishment and deterrence.  538 U.S. at 419.  Although ConAgra denies that plaintiffs were entitled to any punitive damages, the compensatory awards, even if reduced by remittiturs, are sufficient to achieve punishment and deterrence.

Finally, ConAgra's suggested remittitur in each case represents a gross-verdict number that must be further reduced to determine each party's appropriate share.  The percentages of a

plaintiff's fault and West Side's fault as determined by the jury (or modified by the courts) should be applied to determine the amounts owed by defendants.

## CONCLUSION

For the foregoing reasons, pursuant to FRCP 50(a) and FRCP 59(a) and (e), ConAgra requests

the following relief:

(a)      judgment in ConAgra's favor and against all plaintiffs as to plaintiffs' claims, or in the alternative, as to plaintiffs' claims for punitive damages;

(b)      judgment in ConAgra's favor and against West Side as to ConAgra's claims and West Side's claims;

(c)      alternatively, a new trial as to all issues of liability and/or damages in the case;

(d)      in the further alternative, a remittitur of the verdicts to the following amounts: Justin Becker [$8 million compensatory (prior to adjustment) and $0 punitive]; John Jentz [$12 million compensatory (prior to adjustment) and $0 punitive]; and Robert Schmidt: [$750,000 compensatory (prior to adjustment) and $0 punitive]; and

(e)      such other and further relief that this Court deems just.

Respectfully submitted,

/s/ *Paul V. Esposito*
Paul V. Esposito

John W. Patton, Jr.
John A. Ouska
David F. Ryan
David W. Gray
PATTON & RYAN LLC
330 N. Wabash Ave. Suite 2900
Chicago, IL 60611
312-261-5160
312-261-5161 Facsimile


Joseph C. Orlet, IL# 06197026
Brandan P. Mueller, IL# 06275562
Joseph A. Kilpatrick, IL# 06281909
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105

314-480-1500
314-480-1505 Facsimile

Paul V. Esposito
CLAUSEN MILLER, P.C.
10 S. LaSalle Street
Chicago, IL 60603
312-606-7969
312-606-7777 Facsimile

*Attorneys for defendant ConAgra Foods, Inc.*